**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

DR. DOUGLAS C. SHOENBERGER, P.C.
DBA COOPERSBURG FAMILY PRACTICE

                                       Removed from
                                       Middlesex County Superior Court
                                       Civil Action No. 2181CV00440

          Plaintiff,

v.

                                      **Case No. 21-10345-LTS**

CYNOSURE, LLC

          Defendant.

---

**AMENDED VERIFIED COMPLAINT**

**PARTIES**

1.    The Plaintiff, Dr. Douglas C. Shoenberger, P.C. d/b/a Coopersburg Family Practice (**"CFP")**, is a Pennsylvania professional corporation with a principal place of business located at 101 S. Main Street, Suite 101, Coopersburg, Pennsylvania 18036.

2.    The Defendant, Cynosure LLC ("**Cynosure**"), according to its Corporate Disclosure Statement and Notice of Removal filed with this Court on March 2, 2021, is a Delaware limited liability company, and its sole member, Lotus Buyer, Inc., is a Delaware corporation based in Delaware.

3.    According to the records of the Massachusetts secretary of state, Cynosure is registered as a foreign limited liability company in Massachusetts with a place of business located at 5 Carlisle Rd, Westford, Massachusetts 01886.

1

## JURISDICTION AND VENUE

4.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as a civil action between citizens of different states –Pennsylvania and Massachusetts -- in which the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.   Venue in this Court is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims have occurred or originated in this District, the defendant has a place of business in this District, and the contract at issue in this suit provides for disputes arising thereunder to be litigated exclusively in courts located in Massachusetts applying the substantive law of Massachusetts.

## PROCEDURAL POSTURE

7.   This case was filed as an original action in the Massachusetts Superior Court for Middlesex County on February 26, 2021.

8.   On March 2, 2021, Cynosure removed the action to this Court pursuant to Pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and the Court's local rules in a procedure commonly referred to as "snap removal."

9.   As of the date of removal, Cynosure had not yet been served with the Complaint filed in Middlesex Superior Court.

10.  In its Notice of Removal, Cynosure has asserted  that  removal of this Action on the basis of diversity is permissible under 28 U.S.C. § 1441(b) because Cynosure has not been properly served in connection with the state court proceeding. citing *Gibbons v.*

*Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) and that such practice "is

authorized by the text of section 1441(b)(2)") citing *Encompass Ins. Co. v. Stone*

*Mansion Rest. Inc.*, 902 F.3d 147, 153 (3d Cir. 2018).

11.  In its Notice of Removal, Cynosure has acknowledged that certain district courts in the

First Circuit have remanded cases in similar circumstances. *See, e.g., Gentile v. Biogen*

*Idec, Inc.,* 934 F. Supp. 2d 313 (D. Mass. 2013); *Adams v. Beacon Hill Staffing Grp.,*

*LLC*, No. CV 15-CV-11827-ADB, 2015 WL 6182468 (D. Mass. Oct. 21, 2015), but

that the First Circuit has not yet squarely addressed the issue.

12.  Without taking a position on whether Cynosure's removal of the action was proper,

CFP has filed an Amended Verified Complaint as of right under F.R.Civ. P. 15(A)(1)

because, notwithstanding appearance of counsel for Cynosure, service of process has

not been effectuated as of the date of the amended pleading.

## STATEMENT OF FACTS

13.  CFP is a family-owned family medicine/primary care practice located in Coopersburg,

Pennsylvania.

14.  CFP has been in operation since 1990, providing a wide range of services, including

preventive care, chronic disease management, alternative therapy, as well as Botox®,

Latisse® eyelash booster treatments, and brain function testing.

15.  In or about the fall of 2019, Bryan Biglin ("**Biglin**"), at the time the territory manager

for Cynosure made an unscheduled visit to CFP, and met with Douglas C. Shoenberger

("**Dr. Shoenberger**") to discuss a business opportunity in medical aesthetics.

**In Multiple Sales Pitches, Cynosure Made Several Verbal and Written Representations to CFP About the Efficacy and Profitability of its TempSure Machine and the Superior Quality of Cynosure's Customer Support.**

16.    Thereafter, on or about October 2, 2019, Dr. Shoenberger, together with Alicia Shoenberger ("**Alicia"**) and Amber Wuesthoff ("**Wuesthoff**"), CFP's office manager, met with Biglin of Cynosure, so that Biglin could make a sales pitch for the purchase of certain laser devices, including, specifically, a TempSure® machine manufactured/or retailed by Cynosure (the "**Machine**") and used in medical practices for treatments intended to produce reduction of wrinkles and cellulite.  (the **"October 2, 2019 Meeting**").

17.    During the October 2, 2019 Meeting, Biglin told Dr. Shoenberger, Alicia, and Wuesthoff that, among other things, the Machine could be paid off within 6 months to 1 year of its purchase date as a result of Cynosure's highly successful marketing plan which was incorporated into the purchase package.

18.    During the October 2, 2019 Meeting, Biglin also represented that, upon purchase of the Machine, Cynosure would provide CFP with a dedicated success manager who would be performing 90% of the work for advertising and promoting the Machine in connection with which, Cynosure would set up CFP with a minimum of 2 customers per week, a rate sufficient to cover the cost of the equipment.

19.    During the October 2, 2019 Meeting, Biglin also represented that the dedicated success manager would earn bonuses directly related to CFP's sales success.

20.    During the October 2, 2019 Meeting, Biglin also represented that the dedicated success manager would hold open houses, handle the advertising, and help CFP set up its waiting room and patient rooms in a way that was geared toward profitability.

21.  During the October 2, 2019 Meeting, Biglin also represented that Cynosure would

connect CFP with an online advertising/marketing, known as "PatientPop" in

connection with which, CFP would be number one on Google's search algorithm for the

Machine in CFP's area.

22.  At the conclusion of the October 2, 2019 Meeting, Alicia asked Biglin to email her with

a summary of the representations he had made during the October 2, 2019 Meeting.

23.  By email dated October 3, 2019, Biglin wrote to Dr. Shoenberger and Alicia as follows

(alterations in original):

> Dr Schoenberger and Alicia,
>
> Thank you again for taking the time to meet with me today, it was a pleasure
> to see you again.  As we discussed, I wanted to send a follow up email to
> recap our meeting, provide some more information on the device itself,  and
> list out the information gathering steps we put together this afternoon.
>
> Cynosure will insulate your practice with three layers of support that has
> never been seen before in this industry:
>
> 1.  Dedicated Account Manager – former Aesthetician or Plastic Surgeon's
>     office manager who's paycheck is tied directly to your success.  Pay off
>     the device in less than 12 months, she gets a bonus.  If you re-invest with
>     the company in less than 12 months, she gets a bonus.  She will also help
>     train your staff, run your open houses once a quarter, she has literal skin
>     in the game to ensure your success.
>
> 2.  Amplified Marketing Portal w/ dedicated Digital Marketing Specialist –
>     Covering every piece of marketing for your waiting room so that your patients
>     are literally asking for these treatments by name, before they hit your exam
>     room.  Create custom logo's, brochures, pamphlets, banners, DVD loops,
>     digital picture frames, etc.
>
> 3.  Web Package – A five figure web package is included with the purchase
>     of device.  A custom website with mobile access and online scheduling,
>     search engine optimization (1st and top page of Google), social media
>     (Facebook/Instagram), and brand reputation.
>
> We are completely outsourcing almost every aspect of marketing in each
> partnership site and transforming the profitability of their practice

forever.  We have created your business profile which will now allow my manager to literally go down to the penny and break down your ROI during our follow up meeting on **October 11ᵗʰ over breakfast**.  Prior to that meeting on the **11ᵗʰ**, please see below for the information gathering steps we put in place:

**October 4th at 10:15am** – Webinar with Max – Introduced via group text message

**October 8ᵗʰ – 5pm -  (Will text to confirm as well)** – Director of Customer Success, Mike Russo.  Understand your ROI with current patient volume.  Mike oversees all of our post sale support and marketing and is responsible for helping implement this technology into our practices.  He has been in the industry for over 15 years and is a wealth of knowledge.  Please ask any questions you have!

**October 9ᵗʰ – 5pm - (Will text to confirm as well) -** Reference Call with Physician (will introduce via group text message) – real time feedback from a peer and ask any questions you have.

About the device itself, please see attached FDA clearances and video links about the procedure. I would also direct you to https://www.realself.com/tempsure-envi to see what patients have been saying about this procedure!

What makes TempSure™ incredible?

-Expandable Platform - Envi, Vitalia, Surgical, now **FIRM**!!
-Real - time temperature sensing technology
-Therapeutic Logic Control = Timed treatments at target tissue temperature
- 300 Watts of Power

**==Link to TempSure Press Release==** [prnewswire.com]

Unlike other Radio Frequency devices, TempSure has the distinct advantage of Therapeutic Logic Control (TLC)- a system that links treatment time with target temperature, allowing for consistent treatment temperatures and high patient comfort levels (additional details below).

==The link below is from the TV show the Plastics. One of the Real Housewives of New York== is getting the treatment done. It is over 4 minutes and will really show you how the treatment works and some great results on the neck!!

https://www.youtube.com/watch?v=7BBdJjuejUc&t=14s [youtube.com]

6

==Lisa Gastineau reality TV star and jewelry designer== getting her first treatment with TempSure !!! Being called the "20-minute Facelift" your patients will be lining up to get this done!

https://youtu.be/tbdRSfB6Z-k [youtu.be]

==Here is a clip of it on Fox News NY.==

https://www.instagram.com/p/Bq0nV66DpPi/?utm_source=ig_share_sheet&igshid=kwhby02lf1ln [instagram.com]

Any other questions please let me know!  Have a great weekend and I look forward to coming back on the 11th!

Best Regards,

Bryan Biglin.

24. Thereafter, CFP determined that it was not yet prepared to purchase the Machine, and suspended discussions with Cynosure about it.

25. However, on February 11, 2020, Biglin returned to CFP to inquire whether the time was now appropriate to re-engage with Cynosure regarding the purchase of the Machine.

26. During the February 11, 2020 meeting, Biglin represented that if CFP purchased the Machine, a dedicated account manager would host catered "open houses," providing food and beverages, to demonstrate the use of the Machine to the public, and that Cynosure would provide post-sales support for the life of the product.  Biglin also promised to put this representation in writing.

27. The following day, February 12, 2020, Alicia spoke via telephone to Mike Russo, Cynosure's "director of post-sales support and marketing" who wanted to explain how to maximize the monetization capabilities of the Machine.

28. Thereafter, on February 24, 2020, Dr. Shoenberger, Alicia and Wuesthoff, all of CFP, met with Biglin and Biglin's manager, Lauren Berest ("**Berest**") area sales manager for

Cynosure to continue discussions about purchasing the Machine. (the **"February 24, 2019 Meeting"**).

29. During the February 24, 2020 Meeting, Biglin and Berest repeated the representations that Biglin had made at the October 2, 2019 Meeting, to wit: that with regular use of the Machine, it could be paid off within 6 months of its purchase date. Specifically, Biglin and Berest assured Dr. Shoenberger Alicia and Wuesthoff that:

   a. There would be a guaranteed pay off within six to twelve months of the Machine purchase date as a result of Cynosure's highly successful marketing plan, and that CFP would qualify for an IRS Section 179 tax deduction (relating to equipment purchases) in the year 2020.

   b. CFP would be Number 1 on Google searches, drawing customers in through geofencing (a service that triggers an action when a device enters a set location).

   c. CFP would get a minimum of 2 patients seeking Machine-based treatments per month, and Cynosure's account manager would set up CFP's marketing displays at the CFP premises to help advertise the Machine to CFP's patients.

30. During the February 24, 2020 Meeting, Berest provided CFP with a document entitled "Proposal Prepared Exclusively for Coopersburg Family Practice," which included provisions for "First to Market Opportunity," "Amplified Marketing Practice Support," "Premier Lender Benefits," "Practice Transformation Plan," "Additional Post-sale support," and "Patient Pop," among others.

31. Near the conclusion of the February 24, 2020 Meeting, CFP and Cynosure executed a one-page document entitled Cynosure Customer Purchase Agreement – Cynosure's

form contract (the "**Purchase Agreement**") for the Tempsure® Machine for a purchase price of $130,750 ($138,595 after tax).

32. Although the Purchase Agreement, in language above the signature line under the heading "Acceptance Agreement," provides, in part: "This Agreement is subject to Cynosure's k and conditions of sale contained or referred to herein…" Cynosure never delivered a document to CFP entitled "terms and conditions of sale."

33. Cynosure did deliver to CFP a document to CFP entitled "Terms and conditions of Service."

34. The Purchase Agreement Terms and Conditions of Service provides, in pertinent part: The Customer shall receive the following services:

    a. Unlimited telephone and email support from Cynosure's Technical Service team…

    b. …Cynosure will use commercially reasonable efforts to provide a response to Customer Inquiry within 48 Coverage Hours…

    c. Labor, travel, shipment and covered parts…

    d. Cynosure shall repair through field service, replace or provide a loaner for the Equipment in Cynosure's sole discretion, should the Equipment become inoperative through normal and proper use and operation…

35. The Cynosure Customer Purchase Agreement product description section provides, that, included with the Machine are, among other things:

■ Tempsure® Envi face application, including

■ Treatment Handpieces (25mm, 30mm, 60mm) 25 hr life each handpiece

■ Footswitch and power cord

- ■ Tempsure® Firm body application including
- ■ 3 treatment handpieces (25mm, 30mm, 60mm) 25 hr. life each handpiece

**CFP Financed the Purchase of the Machine at an Increased Cost.**

36. CFP financed the purchase of the Machine through Cynosure's recommended finance company, Balboa Capital Corporation of Costa Mesa, California ("**Balboa")** .

37. Thus, on or about February 24, 2020, CFP executed an Equipment Finance Agreement with Balboa (the "**Balboa Finance Agreement**").

38. The Balboa Finance Agreement provides that the first 6 installment payments to be made thereunder are in the amount of $99.00, each.  The remaining installment payments are in the amount of $3,235.04. The total of all installment payments under the Balboa Finance Agreement is $194,102, including simple interest at 6%.

39. Under the terms of the Balboa Finance Agreement, CFP was required to pay an advance payment of $349.00, including a $25 documentation fee.

40. Pursuant to Balboa Finance Agreement, Balboa has a security interest in the Machine, giving Balboa the contractual right to record a UCC-1 financing statement.

41. Dr Shoenberger, individually, was required to guaranty payment under the Balboa Finance Agreement.

42. Thereafter, the parties scheduled a Machine installation date of March 3, 2020.

**When Cynosure Installed the Machine at CFP, it was Missing Critical Working Parts.**

43. On or about March 2, 2020, a day prior to the scheduled Machine installation date, Cynosure installed the Machine at the CFP premises.

44.   However, on the date that Cynosure installed the Machine, the "IEC-XHP1" and the "IEC Foot-Controlled HP" cords that control the handpiece for use with the foot switch specified in the Purchase Agreement product description were not functioning properly.

45.   Additionally, the 60mm handpiece, also specified in the product description, also was not functioning properly.

46.   On the same date, March 2, 2020, Alicia telephoned Jennifer Kramer ("**Kramer**"), a Cynosure representative to inform Cynosure about the inoperable 60mm handpiece, which was vital for the training schedule for March 4, 2020.

47.   However, on the scheduled training date, March 4, 2020, Kramer informed Alicia that Kramer would need to place a work order to replace IEC-XHP1" and the "IEC Foot-Controlled HP" cords and, and that she would follow up with respect to an existing work order for the 60mm handpiece.

48.   Cynosure delivered to CFP the 60mm handpiece on March 6, 2020.

49.   CFP planned to schedule a second training date to refresh CFP's staff 's knowledge of the Machine, and to train Dr. Shoenberger regarding the surgical functions of the Machine.

50.    Thereafter, however, Cynosure never followed up to schedule a second training.

51.    The section of Cynosure's Machine manual describing the foot switch provides, in part:

> A single pedal or double pedal footswitch can be used to activate RF for a connected handpiece. The generator includes two foot switch ports and both ports support single and double-pedal foot switches. The single pedal footswitch is used to activate the RF for the monopolar ENVI handpieces and the bipolar forceps. It also activates the coagulation mode for those TempSure devices that do not have the surgical upgrade. The dual-pedal footswitch can be used to activate RF for Smart handpieces, COAG and bipolar.

52.  Without the IEC-XHP1" and the "IEC Foot-Controlled HP" cords, it would not be possible to perform the Machine's surgical cutting and coagulation functions.

53.  Moreover, Cynosure did not provide training to Dr. Shoenberger for the use of the surgical functions of the Machine.

54.  Between March 3, 2020 and September 2020, CFP, via telephone or virtual meetings, made multiple queries and requests to Cynosure to provide a fully-functioning foot switch and the 60mm handpiece, which still had not been provided nearly 7 months subsequent to the Machine installation date.

55.  During the same period of time as that referenced in the preceding paragraph, Cynosure had been paid in full for the Machine, and CFP had made each of the installment payments due under the Balboa Finance Agreement.

56.  Cynosure did not deliver the IEC-XHP1" and the "IEC Foot-Controlled HP" cords until September 22, 2020, nearly 7 months after the installation of the Machine.

57.  Because CFP is a medical practice, for liability and ethical reasons, CFP determined that it could not have its personnel use the Machine on patients until they have been fully trained and certified by Cynosure.

**Cynosure Promised a "Dedicated Success Manager; None of the *4* Account Managers Actually Assigned to the Account in Succession Were "Dedicated" or <u>Knowledgeable.</u>**

58.  As set forth in the preceding paragraphs, one of Cynosure's promises to CFP was that a dedicated account representative would train CFP's staff on the use of the Machine.

59.  However, during the span of less than a year from the date of purchase of the Machine, Cynosure assigned 3 different account managers in succession to the CFP account.

60.  The three account managers that Cynosure assigned to service the CFP account were: Jayme Hudson, Allie Bracken, and Lena Kaback.

61.  Of the account managers identified above, only Lena Kaback actually visited the CFP premises, and did so for the first time on January 18, 2021, 11 months after CFP purchased the Machine.

62.  Thus, each successive Cynosure account manager needed to be educated about CFP's situation, and none were sufficiently knowledgeable about it to render effective assistance.

63.  On March 4, 2020, two days after date of the installation of the Machine, Cynosure representative Jennifer Kramer performed an initial training on the Machine with CFP's staff.  This training session was the only time that CFP actually used the Machine.

64.  Cynosure did not provide training certificates to CFP until August 19, 2020, 5 ½ months after the date of Machine installation.

**Cynosure's Promised Marketing Services Were Ineffective and Incompatible with CFP's Model.**

65.  CFP's prime incentive for purchasing the Machine from Cynosure was Cynosure's heavily-promoted  marketing and advertising plan, and Cynosure's promises of guaranteed success.

66.  As of the date of the within Amended Verified Complaint, Cynosure representatives have not participated in any of CFP's advertising meetings.  Nor have Cynosure representatives  assisted in the launch of CFP's website, which was to feature the Machine and the services to be made available because of it.

67.  As part of Cynosure's marketing plan for CFP, Cynosure promised marketing support through its in-house company known as PatientPop, Inc. ("**PatientPop**").

68.    The PatientPop website -- <u>PatientPop » The Proven Practice Growth Platform</u> – makes

the following representations, among others:

### Grow your practice With PatientPop

With a focus on continuous innovation, PatientPop offers the first all-in-one practice growth platform that's HIPAA-compliant, delivers measurable improvements, and proven to grow your practice.

### Attract more patients

We'll help you establish a prominent web presence to improve your search result rankings, and reach more patients across web and social. Stand out with a high-performing website, engaging social media posts, blog content and more.

### Manage your reputation

Skyrocket your online reputation with provider-specific solutions. Establish a continuous feedback loop with automated patient satisfaction surveys that increase your positive testimonials and help improve the quality of your patient interactions

### Modernize your patient experience

Convert web searches into patients with easy-to-use online booking, that's intuitive and mobile responsive. New and current patients can schedule an appointment wherever and whenever they find you online.

### Enhance with EMR integration

We integrate with the most widely used practice management and EMR & EHR systems like athenahealth, Greenway, and Dentrix, so your office and patients benefit from a streamlined experience.

69.    On February 27, 2020, CFP signed a service contract, for two years of advertising, with

PatientPop, Cynosure's in-house company.

14

70. Because CFP never had a single dedicated account manager, CFP's onboarding meeting with PatientPop was not scheduled until August 2020, approximately 6 months after the date of the PatientPop contract.

71. Moreover, upon executing the PatientPop contract, PatientPop represented that it was working to integrate its software and systems with NXGN Management, LLC ("**NextGen**") -- CFP's Electronic Health Record ("**EHR**") provider. However, PatientPop never integrated the systems.

72. Because of the incompatibility of NextGen and PatientPop, CFP's patients would be unable to use CFP's website to schedule or request appointments.

73. Accordingly, the PatientPop services are of diminished value to CFP.

**Cynosure Rebuffed or Ignored CFP's Multiple Requests to Provide the Promised Services, or, in the Alternative, to Take Back the Machine**

74. Multiple times between March 2020 and January 2021, CFP, mostly though its practice manager, Alicia Shoenberger, made multiple requests to Cynosure to correct the problems with the Machine's non-delivered or non-functioning parts, and with the customer support, and marketing services that Cynosure had promised.

75. Cynosure was largely unresponsive to the above-referenced requests.

76. Because of the multiple problems with the Machine and the associated promised services as detailed herein, and because CFP was never able to complete training on the Machine, including, especially, for Dr. Shoenberger, CFP did not use the Machine so that it would be in a condition suitable for return to Cynosure.

77. By email dated May 4, 2020, CFP requested that Cynosure take back the Machine and refund CFP's costs associated with the purchase.

78. Lauren Berest, ("**Berest**") Cynosure's sales manager as of that date, refused to honor CFP's request for returning the Machine, and directed CFP to communicate with Balboa regarding inquiries about payments or other options for relief.

79. By email dated August 12, 2020, Alicia  reached out to Berest again to state that no Cynosure "dedicated success manager" had contacted CFP since the end of March 2020, and that Dr. Shoenberger requested that such a manager come to the office the following Monday Berest did not respond.

80. By email dated August 12, 2020, Allie Bracken responded to Alicia's email from earlier that day and introduced herself as the new dedicated account manager.

81.  On August 18, 2020, Robert Daley ("**Daley**") responded: "Hi Alicia, Lauren [Berest] is no longer with Cynosure, as I am getting all of her emails. If you would like to discuss, please feel free to give e a call or set up a tie to discuss.  Thank you!"

82. That same day, August 18, 2020, Alicia telephoned Daley to explain that CFP was unhappy with Cynosure's unfulfilled promises, and that as of that date, CFP still had not received fully functioning missing pieces.

83. During the August 18, 2020 telephone call, Alicia also informed Daley that CFP had not used the Machine since the training date in March 2020, and that it wanted to return the Machine, as it was extremely dissatisfied with it and with Cynosure's services.

84. While Daley apologized, he refused to accept the return of the Machine.

85. However, Daley informed CFP that its Machine's unlimited warranty would be extended by two years beginning on August 18, 2020.

86. By email dated December 22, 2020, Lena Kaback emailed Amber Wuesthoff to

introduce herself as the 3rd new Cynosure representative in less than a year.  The email

reads:

> Hi there,
>
> My name is Lena Kaback, I am happy to introduce myself as the newest addition of the growing Cynosure team in the Northeast.
>
> My role as your Customer Success Manager is to make sure we are driving product utilization for all of your devices.  I would love to meet with you to bring value to your team, please feel free to message or call me directly at any time!  Do you have availability for lunch in January?
>
> Happy Holidays!

87. Alicia Shoenberger responded to Kaback's email the same day, December 22, 2020 as

follows:

> Hi Lena,
>
> I am reaching out on behalf of Coopersburg Family Practice.  I would love to set up a time to meet.  We've been anticipating someone to help us with launching the machine in our practice.  We've not started performing the service at this time due to not having a rep from the company.  Can you send me possible dates you are available?  If you are able to spend a 1/2 day assisting in implementing the machine we purchased and hopefully we could schedule an open house for February 2021 that would be great.
>
> Thank you and I look forward to hearing from you.

88. By email dated January 6, 2021, a person named Jamie Destoglu, whom no one at CFP

had heard of, with an email address of Jamie.Destoglu@cynosure.com, contacted Alicia

Shoenberger  trying to sell an extended warranty package for the Machine for

$8,995.00.  The email reads, in part(alterations in original):

17

Hello,

Attached is a service contract quote for your <u>TempSure System</u>.
The warranty is set to expire <u>March 3, 2021</u>. **In order to extend your service coverage and take advantage of the discounts, please send back the signed copy of the service agreement prior to February 2, 2021.** Please sign and fax the attached agreement to 888-270-5029…

Of course, Cynosure does not expect our devices to fail, but malfunctions do occur. We highly recommend yearly calibratoin on the TempSure device to ensure safety and efficacy. This yearly calibration has a billable value of ~$4,000; however this service would be included with coverage. Because the TempSure is a radiofrequency based system, the vast majority of the time the system will need to be brought in-house in order to properly calibrate and service it. The downtime associated with sending the system in-house for repair makes the loaner system a primary benefit of service coverage. Loaners are only provided to contract customers.

For renewal of coverage please fax back the signed contract to 888-270-5029, scan the signed contract to <u>jamie.desteoglu@hologic.com</u> or request a DocuSign to be sent for electronic signature. We will then reach out for payment information…

89. As of the date of Jamie Destoglu's January 6, 2021 email quoted, in part, above, it had been almost 11 months since the purchase and installation of the Machine. During this period of time CFP had made each installment payment due under the Balboa Finance Agreement, but still had not used to Machine, due to the multiple issues with delays in delivering fully working parts, lack of training, especially for the Machine's surgical support functions, delays in the provision of certifications, lack of customer support, and the revolving door of multiple account managers.

90. Furthermore, as of the date of Jamie Destoglu's January 6, 2021 email,  CFP had advised Cynosure multiple times in writing, beginning as early as May 2020, that it was unable and/or unwilling to use the Machine for the above-stated reasons, and wanted to return it.

91.  Thus, on January 18, 2021, when Lena Kaback, the last of three Cynosure account managers assigned to CFP visited CFP, CFP attempted to return the Machine to her. Kaback refused to accept the attempted return.

92.  By letter dated January 22, 2021, CFP, through counsel, made demand on Cynosure to rescind the Cynosure purchase contract, refund the Installment payments made by CFP to date, and to pay the balance owed to Balboa directly to Balboa.

93.  By letter dated February 9, 2021, Cynosure through counsel, responded to the January 22, 2021 demand letter denying liability, and asserting, among other things, that it had fully performed under the contract between Cynosure and CFP.

94.  Cynosure's February 9, 2021 response letter provides, in part, "[A]s you are likely aware, per the Agreement '**All Sales are Final.  Cynosure grants no right of return.**' We accordingly cannot accept a return, provide a refund to your client, or pay any balance due balboa Capital."

95.  As set forth above, Cynosure never provided CFP with a document containing the language quoted in Cynosure's response letter.

## CAUSES OF ACTION

### COUNT I

#### Breach of Contract

96.  The Plaintiff, CFP, restates, realleges, and incorporates herein by reference all previous paragraphs of this Amended Verified Complaint.

97.  The Cynosure Purchase Agreement, together with Cynosure's verbal and written representations made to CFP during Cynosure's multiple sales pitches, obligated Cynosure to timely provide a complete, fully functioning Machine.

98. The Cynosure Purchase Agreement and/or the verbal and written representations of Cynosure sales representatives who guaranteed that such terms were incorporated in the contract, also obligated Cynosure to provide dedicated customer support, training, and marketing support.

99. Cynosure never provided CFP with any document entitled "Terms of Sale."

100. Cynosure breached the contract by, among other things, failing to timely provide a fully functioning Machine, failing to provide a dedicated account manager, failing to provide effective training and training certificates, and failing to provide marketing support to the level that it promised.

101. As a direct and proximate result thereof, CFP has been deprived of the benefits of its bargain, its investment opportunity, and other opportunities, and otherwise has been damaged.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing

102. CFP restates, realleges, and incorporates herein by reference all previous paragraphs of this Amended Verified Complaint.

103. The contract between CFP and Cynosure incorporates a covenant of good faith and fair dealing implied by law.

104. Cynosure breached the covenant of good faith and fair dealing by, among other things, failing to timely provide a fully functioning Machine, failing to provide a dedicated account manager, failing to provide effective training and training certificates, failing to provide marketing support to the level that it promised, and, through its members or their agents, making material misrepresentations to CFP.

105. Cynosure also breached the covenant of good faith and fair dealing by failing, repeatedly, to respond or to respond timely to CFP's multiple queries and complaints, by its failure to deliver all of the documents that it relies on for refusing to rescind the contract, and by insisting that CFP pay additional monies to extend a warranty for a product it cannot use because of Cynosure's failure to deliver promised services, support, training, and functioning parts.

106. As a result thereof, CFP has been damaged in an amount to be determined at trial.

## Count III

## Misrepresentation

107. CFP restates, realleges, and incorporates herein by reference all previous paragraphs of this Amended Verified Complaint.

108. The Defendants, either directly, or through their agents, made certain promises and representations to CFP and its principals, including, but not limited to, those made at the October 2, 2019 Meeting, the February 11, 2020 Meeting, the February 24, 2020 Meeting, and the October 3, 2019 email.

109. The representations were not true when made or were made with reckless disregard for their truth or falsity.

110. CFP reasonably relied to its detriment on Cynosure's misrepresentations as detailed herein.

111. As a result of the foregoing, CFP has been damaged in an amount to be determined at trial.

## Count IV

### Violation of M.G.L. ch. 93A, sec. 11

112. CFP restates, realleges, and incorporates herein by reference all previous paragraphs of this Amended Verified Complaint.

113. CFP and the Cynosure are each engaged in trade or commerce.

114. Cynosure's acts, omissions, and representations as described herein, including but not limited to the making of material multiple misrepresentations of fact to CFP to induce CFP to purchase the Machine from Cynosure, and to finance it for over $190,000, for failing for to timely deliver the Machine with all of the critical parts fully-functioning, failing to provide  a dedicated account manager, failing to provide timely, complete and adequate training on the Machine, failing to provide adequate marketing and customer support despite having induced CFP to purchase the Machine on the detailed promises of same, and failing, insisting that CFP pay even more money for an extended warranty for a Machine which it has cannot use in the manner that Cynosure promised it would be able to do so, and, despite multiple demands, to take back the Machine and refund CFP's money paid for the purchase of the Machine,  constitute unfair and/or deceptive acts and practices declared unlawful by the Massachusetts attorney general.

115. The unfair and deceptive business acts or practices identified herein occurred primarily and substantially in the Commonwealth of Massachusetts.

116. CFP  has suffered a loss of money and property as a result of the defendants' violation of M.G.L. ch. 93A, sec. 11.

117. As a result thereof, CFP has been damaged.

## PRAYERS FOR RELIEF

**WHEREFORE**, the Plaintiff, Dr. Douglas C. Shoenberger, P.C. d/b/a Coopersburg Family

Practice, moves this Honorable Court to enter the following relief:

1. Enter judgment for CFP and against Cynosure in an amount determined by this Court;

2. Pursuant to Count IV, treble the amount of any monetary award and order the defendant

   to reimburse CFP for all of its reasonable attorneys' fees and costs incurred in the action;

3. Award CFP statutory interest to run from the date of the breach of contract;

4. Enter such other further relief as is equitable and just.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.


DR. DOUGLAS C. SHOENBERGER, P.C.
DBA COOPERSBURG FAMILY PRACTICE


By its Attorney,

*/s/ Seth H. Salinger*

Seth H. Salinger (BBO No. 555426)
53 Langley Road, Suite 270
Newton, MA  02459
(617) 244-7630 (phone)
(877) 222-3572 (fax)
sethsal@gmail.com

Dated: March 5, 2021

# VERIFICATION

I, Alicia Shoenberger, the practice manager of the plaintiff, Dr. Douglas C. Shoenberger, P.C. d/b/a Coopersburg Family Practice, hereby certify that I have read the foregoing complaint, that the facts stated therein are true, and that, I have made a reasonable and diligent investigation to confirm the validity of so much of the facts as are alleged upon information and belief, and after such investigation, I believe them to be true.

Signed under the pains and penalties of perjury this 5th day of March 2021.


_____
Alicia Shoenberger

15

**CERTIFICATE OF SERVICE**

      I, Seth H. Salinger, hereby certify that, on this 5th day of March 2021, the foregoing document was filed through the ECF system, the document will be sent electronically to the registered participants, and paper copies will be served via email and first class mail on those indicated as non-registered participants.


           /s/ Seth Salinger
           Seth H. Salinger